UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DR. MELISSA FRANCKOWIAK,

PLAINTIFF,

vs.

**VERIFIED COMPLAINT
AND JURY DEMAND**

CATHOLIC HEALTH, and GREAT LAKE
ANESTHESIA,

Civil Case No.

DEFENDANTS.

---

Plaintiff, Dr. Melissa Franckowiak, alleges as follows:

## PARTIES

1. Plaintiff Dr. Melissa Franckowiak ("Plaintiff") is a natural person with a place of residence in Grand Island, NY 14072.

2. Defendant Catholic Health ("Defendant") is a corporation with a place of business located at 144 Genesee St., Buffalo, NY 14203.

3. Defendant Great Lake Anesthesia ("Defendant") is a corporation with a place of business located at 1001 Main St., Buffalo, NY 14203

4. Plaintiff worked at Defendants' Anesthesia Consultants Associates ("Anesthesia Consultants") location.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and as conferred by 42 U.S.C. §2000e-2 et seq., and by 42 U.S.C. §§ 12101 et seq.

1

6. Defendant is subject to the jurisdiction of this Court and venue is proper in this District pursuant to 28 U.S.C. § 1391 (b) as the acts and omissions giving rise to the claims in this complaint occurred within the Western District of New York and both Plaintiff and Defendant are residents of the Western District of New York.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7. Plaintiff has exhausted administrative remedies as a prerequisite to bringing this claim as follows:

8. On April 13, 2020, Plaintiff filed a complaint with the U.S. Equal Employment Opportunity Commission, Charge Number 525-2020-01126.

9. On April 6, 2022, the EEOC issued Plaintiff a Dismissal and Notice of Rights letter demonstrating that she has exhausted her administrative remedies.  The last day to file, according to the EEOC Dismissal and Notice of Rights letter, is July 5, 2022.

## FACTS

10. Plaintiff worked for Anesthesia Consultants Associates ("Anesthesia Consultants") from July 1, 2012 to present.  Plaintiff's contract ended April 30, 2020 due to termination of her contract by Kenmore Mercy Hospital and Catholic Health.

11. Plaintiff's position was an Anesthesiologist.

12. Walt Ludwig, Robert Ramsdell, and Joe Ralabate were involved in this decision.

13. Plaintiff was hired by/began working for Kenmore Mercy Hospital ("Kenmore Mercy") on July 1, 2012.

14. Plaintiff's position was an Anesthesiologist.

15. Plaintiff was hired by/began working for Catholic Health ("CHS") on July 1, 2012.

16. Plaintiff's position was an Anesthesiologist.

17. Plaintiff was not hired by Great Lakes Anesthesia and was forced out of her current job at Kenmore Mercy with Anesthesia Consultants Associates as of April 1, 2020.

18. As an Anesthesiologist Plaintiff provided anesthesia for patients undergoing surgical procedures.

19. At all relevant times, Walt Ludwig is the President of Kenmore Mercy.

20. At all relevant times, James Fitzpatrick is in charge of medical staff at Kenmore Mercy Hospital.

21. At all relevant times, Dr. Joe Ralabate is the Chief of Surgery at Kenmore Mercy Hospital.

22. At all relevant times, Anne Hedges-Creighton is the OR Director at Kenmore Mercy Hospital.

23. At all relevant times, Mark Sullivan is the CEO of CHS.

24. Male Surgeons at the facility influenced administration by speaking negatively of female physicians, an older disabled surgeon, and anesthesiologists of different races and ethnicities over the past several years while Plaintiff was employed.

25. On March 19, 2020, Dr. Ross Sherban requested Plaintiff not be in his room in the middle of a case. He scheduled a series of completely elective cases against Erie County Department of Health's advisement considering the COVID 19 threat. His patient initially disclosed to Plaintiff that he had been trying to cancel the case all week, did not want the surgery because of the risk of contracting the virus, and that it could wait, but was coerced into proceeding by the office calling and telling him he needed to get in and have it. This case was not an emergency. Dr. Sherban's first patient disclosed he was only having the surgery to get his benefits up to 100 percent again. Plaintiff simply discussed informed consent with the patients as required by her malpractice carrier and law. Dr. Sherban chastised Plaintiff, speaking to her in a demeaning

way in front of the patient, addressing Plaintiff by first name, and telling her she was "done." Dr. Sherban had Dr. James Peppriell relieve Plaintiff, which was extremely embarrassing and insulting.

26. Behavior was allowed by Catholic Health that advanced the financial position of the hospital by lucrative surgeries that were not in the safest interest of patients. Plaintiff was the fourth female anesthesiologist Dr. Sherban has requested not be in his room. He does not speak to other male doctors this way. His concerns are promptly addressed by Catholic Health while Plaintiff's are not.

27. For example, last year Dr. Sherban did not have Traci Meinhardt assigned to his room. He made a scene and demanded she be assigned to his room, so her assignment was moved in the middle of caring for another patient. Dr. Sherban received this favorable treatment by demanding older female nurses such as Debbie Hayes and Donna Floria be removed from his room in place of younger less experienced female nurses.

28. Dr. Vigna made similar requests for young X-Ray Technicians and younger Nurse Lydia who was repeatedly assigned to his room.

29. In contrast, when Dr. Gurske or other female doctors requested specific equipment they were labeled "demanding" or "bossy".

30. Kenmore Mercy dictates Plaintiff's hours, what to wear, provides all tools and equipment for her to do her job, provides the facility in which Plaintiff operates, and provides compensation. Kenmore Mercy's administrative staff and surgeons have dictated nearly every aspect of her practice, including what meds are ordered.  This is a deviation from normal medical practices, as it is abnormal for one doctor to give orders to another doctor such as what medicine the former should prescribe, how to keep the blood pressure, even against safety concerns, what

airway device to use, and whether or not to paralyze the patient. Anne Hedges Creighton has attempted to direct the practice by making "anesthesia protocols." This goes against the independent nature of the work described in Plaintiff's contract with Kenmore Mercy.

31. CHS controls the way Plaintiff practices and discriminates against female physicians.

32. CHS condones surgeons practicing in their workplace to discriminate against female physicians. The behavior by CHS and the way this entity condones surgeons discriminating against female physicians forces many of the female physicians out of their practice.

33. Dr. Robert Ramsdell, the President and higher partner at Great Lakes Anesthesia stated to Plaintiff during her interview that she might not want a position that required travel with their group to other Western New York sites because she "ha[s] young kids." Plaintiff did not receive a job offer from Great Lakes Anesthesia, only an occasional per diem arrangement to work elsewhere at their contracted sites. The agreement did not include Kenmore Mercy, offered a fraction of the earning potential, and no opportunity for equal partnership.

34. Plaintiff was constantly referred to as "the lady doctor" when she first began working at Kenmore Mercy.  Other female physicians, including Dr. Bhayani, Dr. Bardowalla, and Dr. Carpenter were subjected to the same treatment as well.  Dr. Carpenter was called "weird", "annoying", and "difficult to work with" despite making the same requests to staff that male colleagues do. Colleagues including Phyllis Shafer laughed about the treatment female doctors experienced and said we were "taking another link off the Christmas countdown chain" when Dr. Carpenter left.  In December 2019 Nurse Shafer asked Plaintiff "What the hell are you wearing? You look like Madeleine." Plaintiff has been asked: "why are you so dressed up?" when changing her clothes in the ladies locker room, when Plaintiff was simply dressing

professionally. Employees seem more concerned with the way Plaintiff looked than her ability to care for patients' lives. The same questions are never asked of male doctors wearing suits.

35. All three of these female physicians as well as Plaintiff were prevented or discouraged from working with Dr. Ross Sherban, Dr. Michael Stoffman, and other surgeons for reasons that were biased and pretext for discrimination. The same things that happen with the male Chief of Anesthesia during the case are not tolerated by female anesthesiologists. For example, Plaintiff raised the concern that a patient's blood pressure might be too high to proceed with Dr. Stoffman's case. It was over 230 systolic. Many surgeons would decline to do the surgery and it would be mutually agreed upon that it would be safer to reschedule. Some would not. Dr. Stoffman complained to the Chief of Anesthesia rather than discussing the problem.  Dr. Stoffman did this to belittle Plaintiff's professional opinion. If one of the male anesthesiologists has a concern, it is considered, and they are treated with respect.  The focus at Kenmore Mercy is appeasing the surgeon who brings in millions of dollars, not what is best for the patient.  These surgeons have made complaints against female doctors that were not made against my male colleagues.  One could infer discrimination based upon these disparities between genders.

36. Plaintiff is often addressed by the nursing staff at Kenmore Mercy, including supervisors, by her first name.  Male colleagues are always referred to as "doctor."  It is demoralizing and insulting to have Plaintiff's title reduced or blatantly ignored daily after she has worked toward a position of equality and perform the same duties as her male colleagues.

37. Plaintiff constantly must prove herself and still does not receive the same treatment as male doctors in the CHS.  Female doctors are treated less-than and disparately compared to male doctors.

38. Nursing supervisor Anne Hedges Creighton commented about Plaintiff: "All that one does is eat all day." She has also made comments about Plaintiff being too thin, about the way Plaintiff looks, the way she dresses, and other inappropriate comments on Plaintiff's appearance. These seem to take precedence over anything job-related and are demeaning. Male doctors are not treated or commented on in this fashion.

39. When new operating rooms were built around 2014, male doctors had their own changing room separate from OR staff and it was labeled "doctors," while female staff had one room, no separate room for female doctors. Male doctors still have their own changing room. Male physicians walk into the doctor's lounge and say hello to their male colleagues. These physicians do not even acknowledge Plaintiff.

40. When Plaintiff first introduced herself to Dr. Fitzpatrick in 2012 when she began working at Kenmore Mercy, he grumbled: "yeah, I know who you are" and has never said hello or acknowledged Plaintiff directly since in passing.

41. Plaintiff has been singled out for minor complaints by Ann Hedges Creighton. She repeatedly tells employees to document things so that they can "get rid of people," and on one instance shortly after she took over as OR Director asked Plaintiff to write a complaint about a contracted spinal cord monitoring tech they we could "get rid of her.," Male colleagues commit similar or worse infractions, including safety violations, and are not chastised.

42. For example, Dr. Stoffman regularly does not wear a jacket outside and inside the OR when CHS nursing staff and administration began mandating what they wore and was not punished. Surgeons are repeatedly late for their assignments and have no repercussions. Dr. Stoffman was observed lewdly kissing physician assistant Kristen Campagna in the sterile corridor. Dr. Ramsdell and other physicians taking over from Great Lakes that are currently working for

Defendants per diem are on cellphones and laptops, conducting business deals in the middle of cases with no repercussions.  Dr. Sherban brought an unsterile lounge chair into the sterile corridor to nap on for his comfort without repercussions.  Conversely, Plaintiff was chastised for nail polish when the only prohibition per CHS medical staff policy was on acrylic nails. Plaintiff emailed medical staff president Dr. Mark Jajkowski to ask for clarification but her email was ignored.

43. Additionally, Mrs. Hedges Creighton said to Plaintiff in the winter of 2019 as Plaintiff was entering the female locker room: "You always look like a little kid to me when I see you out of scrubs. Like you're 14 years old." This nurse director repeatedly addresses Plaintiff by my first name, "Melissa," rather than my professional title, "Dr."  This occurred most recently on March 31, 2020 when Plaintiff asked for proper Personal Protective Equipment which she is not providing adequately for staff. She singled out an attractive female spine sales representative for nail polish as well, despite her having no ability to touch patients in her duties.

44. Plaintiff has been harassed by colleagues by having her picture taken by colleagues attempting to get her in trouble for breaking policy.  Plaintiff has conformed to the same standards of behavior as male colleagues and they are not harassed in this manner.  Other staff and colleagues have been observed breaking the following protocol:  using cell phones in the OR, masks down, sterile procedure broken by no one watching room set up, no one in rooms on multiple occasions due to insufficient staff for breaks and lunches due to flip room demands and quick turnover demands.  They have not been punished for these behaviors.

45. "Eating in OR" was noted on complaints about anesthesia. A picture of a candy wrapper allegedly in the OR was blamed on Plaintiff even though she was not eating in the OR.  Plaintiff

has not witnessed any of her colleagues actually eating in the OR, though Plaintiff has witnessed multiple staff members.

46. Female doctors are constantly made to prove themselves.  Even when they perform jobs or tasks that their male colleagues are unable to do.  For example, Plaintiff intubated a difficult patient in the ER that Dr. Gough and Dr. Brewer could not and a COVID19 patient on March 24, 2020 that Dr. Brewer was unable to succeed at.  Female doctors receive little credit, if any, while our male colleagues are honored at Tribute to Angels dinners, among other things.

47. Plaintiff texted Dr. Gough, a critical care doctor and one of the Board members at CHS, to volunteer to be one of the leaders assisting in planning the emergency response to COVID. He indicated Dr. Fitzpatrick would contact Plaintiff about this and her concerns about elective spine surgery continuing. Dr. Fitzpatrick, VP of the hospital, never even acknowledged Plaintiff directly but went to her "boss", as he described him, Dr. Krzystof Merkel Chief of Anesthesia and Plaintiff's business partner. Dr. Merkel volunteered Plaintiff to risk her life as a foot soldier to intubate critical patients that he and other male doctors are not skilled enough to perform while simultaneously taking full credit for and receiving numerous awards for. Plaintiff is currently not given enough proper protective equipment nor are many of the staff.

48. Meanwhile, after offering to help with COVID19 as a critical care specialist, Plaintiff received an email about the interim leadership restructuring including ten (10) male doctors who will be serving and appointing other leaders, including a Chief Medical Officer position at St. Joseph's, the designated COVID hospital. Plaintiff received emails on 3/22/20 and 3/25/20 asking to congratulate Dr. Brewer for being promoted to a leadership position of medical director overseeing the ICU at St Joe's, and to congratulate Dr. Ken Eckert, Dr. Thomas Raab, Dr. Ray Ogra, Dr. Matthew Smith, Dr. Shehata, and Dr. Tatiglota all for similar new leadership positions

throughout Catholic Health. No female doctor that Plaintiff is aware of holds any leadership position there. Around summer 2019 Plaintiff discussed her concerns, including the overwhelmingly male nominating committee of officers and suggested more women be allowed to participate, with Dr. Michael Gough. He listened, but to date, no changes have been made and leadership is still male-dominated.

49. Plaintiff has asked Mr. Croisdale to select her to provide in-services to facilitate block placement and on other topics she supervises. Plaintiff has been there over five (5) years and has fifteen (15) years of experience in her profession. Mr. Croisdale never responded to Plaintiff. Comparatively, Dr. Semidey, a recent male graduate from residency who had been practicing less than one (1) year and is not yet board certified was asked to do a lecture immediately upon joining CHS. Dr. Semidey was praised repeatedly by OR Director Hedges Creighton. OR Director Hedges Creighton also offers awards to male nurses that do far, far less work than the females.

50. In March 2020, OR Director Hedges Creighton spoke with Dr. Violante about an ongoing "anesthesia protocol" for his cases, which included dictating the airway choice, medications to be given, and other specifications that render them, including Plaintiff, employees of Catholic Health.

51. Plaintiff voiced her concern about "flip room" safety during an April or May 2019 meeting with Dr. Ralabate, Walt Ludwig, and Mr. Croisdale. For example, flip rooms in which a surgeon takes longer than an hour and a half for a case and has a patient under anesthesia in another room waiting while he or she is not present are against the Center for Medicare Services guidelines. The patient is left asleep under anesthesia and often the surgeons are having lunch outside the OR or are dictating. This practice can be very unsafe. Plaintiff's concerns were

shunned and ignored.  Catholic Health later retaliated by giving a contract to Great Lakes Anesthesia.

52. All the CME lectures that Plaintiff have been invited to at CHS were conducted by males.

53. Plaintiff was pregnant during the nine (9) months before April 1, 2014 while at Kenmore Mercy. After she returned to work four (4) weeks after her C-section, Kenmore Mercy provided no reasonable place for Plaintiff to pump breast milk from May 2014-2015.  Plaintiff was forced to pump in a changing room, just outside the toilets in the bathroom. It was not private and there was repeated traffic through the area. No time was allowed for this so as not to delay cases. There were no locking doors, and the male housekeepers could come in to clean the room periodically.

54. Staff including Michele Weber, RN and Donna Andersen are constantly asking Plaintiff if she is going to get pregnant again.  When Plaintiff went home sick one day in December 2019, she was immediately asked if she was pregnant by Ms. Andersen.

55. Plaintiff was notified on October 31, 2019 that Catholic Health would not be renewing the exclusive contract.

56. Plaintiff was also told that a "culture change" was needed.

57. Catholic Health took these adverse actions based on bias and its discriminatory perception that younger male officers from Great Lakes are better.

58. Plaintiff was passed over for a promotion in the form of a leadership position with Catholic Health in Summer, 2019, when she indicated that she would like to take on Dr. Merkel's position as Chief when he was ready to retire. Plaintiff made suggestions to Mr. Croisdale that she would like to serve and was told that would facilitate positive relationships between all operating team members and address any concerns. Plaintiff also applied for a wound care

position at Catholic Health in December 2019 and spoke about the job in December 2019 by phone and email with Bridget Conti, a physician retention liaison. Plaintiff was initially told she would meet with someone at the facility in which there was a need for services but then later was not hired.

59. CHS treated male surgeons more favorably than female surgeons or female anesthesiologists. CHS would not chastise or punish the male surgical staff for being late or being delayed. Conversely, it was never acceptable for anesthesiologists to be delayed, for any reason, even when it pertained to patient safety.

60. Any complaints to CHS by male surgeons were met with concern and assurance that problems would be remedied. Any concerns or complaints made by Plaintiff or her other business partners - older physicians of various races, ethnicities, and religions - were barely acknowledged.

61. CHS does not listen to safety concerns, cares only for the bottom line, and shuns any attempt by anesthesiologists that voice concerns that might cause any perceived or slight delay in procedures.  This is particularly the case for female or non-white anesthesiologists.

62. A female surgeon, Dr. Gurske, was spoken of and labeled by CHS employees Aaron Lange, Jeremy Wirth, Michele Weber, and other operating staff as a "complainer," "needy," and "crazy", when voicing same needs as male surgeons whose complaints are immediately addressed.

63. All female anesthesiologists have been thrown out of surgeon's rooms by Drs. Stoffman, Vigna and Sherban at various times from 2011- 2020.

64. An older doctor with a diagnosed disability was not given an accommodation and was shamed for taking more time with patients and was discouraged from being in these rooms. When safety concerns regarding the surgeons not being present at the start of the case were raised to Mr.

Croisdale in the summer of 2019, Plaintiff was simply told, for example, Dr. Fahrbach is one of the surgeons she needs to "keep happy."

65. Male surgeons completely control how they practice in certain circumstances.  An orthopedic doctor has a special team of people he wants in the room and are primarily comprised of young, energetic, and attractive female nurses.

66. Plaintiff has been discriminated against by Catholic Health, Robert Ramsdell and Great Lakes Anesthesia by being offered less favorable jobs by Great Lakes.  These jobs are less favorable because of any of the following detriments: 18 hours per week contractor contract at Great Lakes sites; they are not necessarily at Plaintiff's current position; they are non-partner track positions; they are not full-time; or offer any benefits.  For example, a position offered by Maple Gate Anesthesia had less pay and no partnership opportunities.

67. Great Lakes officers also discriminated against Plaintiff as a female and a mother.  They mentioned her young kids in their meeting with her.  When they explained a full-time job might involve travel and Plaintiff stated she was interested in a full-time job, they suggested Plaintiff might not want that because she has young kids.  Great Lakes partners does not plan to hire Plaintiff at her current salary/role with their new contractual agreement.

68. The contract Great Lakes offered is less than half of what Plaintiff makes with no benefits, no security and no guarantee of working at the current facility in Kenmore.  When Plaintiff discussed the contract that was offered by Dr. Ramsdell during a phone conversation, she said she was looking for a permanent job.  He replied that it "might turn into something permanent if people like you."

69. This behavior frequently happens to female doctors, single parents, or ones of different races or ethnicities.

70. Sexual harassment was prevalent daily to weekly in the form of comments and inappropriate conversation.

71. There is a pervasive "boys' club" mentality at Kenmore Mercy.

72. Inappropriate sexual comments, innuendo, and conversation are the norm at Kenmore Mercy in the OR.  Dr. Franco Vigna frequently makes comments such as: "Come to daddy" when flipping his patients to a prone position and "that's what she said" sexual humor. There was a recent incident where Plaintiff witnessed a neurosurgeon tell his P.A. that she "could be a stripper." Plaintiff was constantly subjected to this type of inappropriate sexual conversation and a complete disrespect toward women.

73. Around Fall 2012, Plaintiff was asked by Dr. Michael Stoffman, spine surgeon, for her personal phone number and asked to get together in Ellicottville.  He stated, "Don't tell anyone." Plaintiff was disgusted as he is married and known to be having an affair with his physician assistant. Plaintiff was later told by Mr. Croisdale that Dr. Stoffman was one of the surgeons that she "need to keep happy."

74. After Plaintiff refused Dr. Stoffman's sexually harassing advances, he took adverse acts against her in the form of being treated differently and rejected from his operating room.  He complained that Plaintiff did not participate in the surgical procedure of applying traction to the spine during the surgery, which Plaintiff has never done with any surgeon in training or attending practice in any hospital in Buffalo. Plaintiff's role is to care for the patient under anesthesia, not put herself at risk for liability for something she is not trained in.

75. Additionally, Dr. Stoffman attempted to force Plaintiff to perform a procedure which was not her responsibility as an Anesthesiologist (performing surgical traction on the weighted cervical spine while part of the operation).  Plaintiff refused to do so since she was not trained on this

procedure.  Dr. Stoffman intentionally embarrassed Plaintiff in front of the entire operating room.  Plaintiff was never asked to do this by any of the numerous other surgeons she has trained under during her residency beyond, in any of the six hospitals she trained in. He later asked Plaintiff in a socially awkward attempt at flirtation if she trusted him.

76. Plaintiff later had to witness a lewd display of affection in the form of kissing and inappropriate touching between Dr. Stoffman and his P.A., Kristin Campagna, who he was having a known affair with. Plaintiff witnessed this in the surgical sterile corridor outside the OR. This is an area where masks are required.

77. Mr. Croisdale, OR manager, said Drs. Fahrback, Vigna, and Stoffman were doctors Plaintiff especially needed to "keep happy."

78. Plaintiff would be hit on and asked out by equipment representatives.  On January 2, 2020 Plaintiff walked into the sterile corridor to get IV fluid and was hit on by equipment representative Aaron Lambe who asked her: "when are you going to let me take you out?  I've been asking you out for years. You never let me take you out." A surgical tech, Jeremy Wirth, commented in December 2019 when Plaintiff entered the break room: "you're getting too old to eat like that." Plaintiff is subjected to constant comments about what she eats.

79. Plaintiff complained of discrimination to Pam Motley and Shannon Lavocat, medical staff. Plaintiff complained specifically about the way female physicians are not respected or given any opportunity for leadership in the Catholic Health System. No one responded to her concerns, whereas any concern from male surgeons seem to be addressed as a priority.

80. Plaintiff raised concerns about the lack of female presence in medical staff nominating committees.

81. Plaintiff sent an email requesting female presence on the nominating committee ballot.  Less than 6% were female doctors on the committee.  4 out of the 59 names were females on a recent ballot, and none at Kenmore Mercy where Plaintiff currently practices.  Plaintiff's emails were not acknowledged. Plaintiff emailed Dr. Mark Jajkowski suggesting some female members on the nomination committee on September 13, 2019 and one regarding attire in the OR on October 26, 2017. This was also discussed in the doctor's conference room with one of the board members Dr. Mike Gough who listened but made no response.

82. Around August or September 2019, Plaintiff indicated to Mr. Croisdale that when her business partner Dr. Krzys Merkel retires, Plaintiff wanted to take on a leadership role as chief at Kenmore Mercy Hospital.   Mr. Croisdale never responded to her.   Plaintiff has been performing scheduling, assignments, and delegating tasks among her group members and the OR team and have received positive responses. Plaintiff has been actively recruiting CRNAs to work in the operating room to have more resources but was shunned when she attempted to discuss going ahead and hiring with Walt Ludwig in September 2019, not long before their contract was terminated.

83. During mid-year to summer 2019 Plaintiff has made numerous requests regarding her desire to apply for and take on a leadership role with CHS. Mr. Ludwig, Dr. Ralabate and Mr. Croisdale refused to discuss business matters with Plaintiff, shunned her, and did not take her seriously because she is a female and a mother.  The contract with Kenmore Mercy was instead offered up to Great Lakes Anesthesia and Plaintiff was told that if she wanted to keep my job, she would need to talk to them.

16

84. As mentioned above, Plaintiff raised concerns about unsafe practices by CHS and the blatant disregard for safety concerns when the choice is between safety and delay or profit.  Any questioning of the surgeons' preferences at CHS is discouraged, shamed, and the doctors bringing these concerns to light are treated disparately by hospital administration, even where it would improve patient safety.

85. Plaintiff expressed concerns over the safety of performing "flip rooms" for Dr. Stoffman and Dr. Vigna due to the length of time between their cases where one OR was being prepared while the surgeon was scrubbed into a different OR.  This was primarily due to the length of time that these surgeons are scheduled to do these types of cases, which was clearly against the recommended limit of 90 minutes as per the chief of neurosurgery here, Dr. Landi. Despite this, Plaintiff's concerns were rebuffed for the sake of profit.

86. Nurses are given opportunity to evaluate anesthesiologists, but Plaintiff is not given the same opportunity.

87. Plaintiff has also complained that women physicians are singled out in a predominantly male environment and constantly made to prove themselves.

88. Plaintiff was retaliated against by Dr. Sherban when he complained to Dr. Fitzpatrick and Dr. Ralabate about her on March 18, 2020 because she raised the safety concern about doing his elective cases in light of the COVID pandemic.

89. Plaintiff was told by text message by Dr. Fitzpatrick's assistant, Shannon Lavocat, that she had to schedule to meet with Dr. Fitzpatrick.  Plaintiff texted Ms. Lavocat that she would like to have a lawyer present because she didn't feel female staff are treated fairly by Catholic Health. Plaintiff scheduled a meeting by phone, but was then told by her Chief they would cancel any meeting and that it was not necessary.

90. During the week of March 8, 2020, Plaintiff was screamed at by one of the incoming Great Lakes partners Dr. Michael Weinberg, who left drugs out in the room. Many were unlabeled, including controlled substances.  Plaintiff was starting a new case in the room and the safety protocol is: "when in doubt, throw it out." Plaintiff threw them out as was appropriate especially considering the infectious risk due to COVID19 and not knowing where the drugs came from. Dr. Weinberg later came back into the room screaming: "Now you've fucked me over! When you don't know Ask! Ask!" Plaintiff wrote up an incident report detailing the verbal altercation and abuse and leaving controlled substances unattended that day on the hospital system event reporting, but her complaint went unaddressed.

91. On December 19, 2019 Plaintiff had to listen to a conversation by Dr. Ryan Wilkins in the operating room with the staff and sales representative regarding the PA he was hiring, describing her behavior in college and how he wouldn't expect to "hire a girl like that," despite referring to a grown woman with a professional license. The conversation was demeaning toward women. Plaintiff has also witnessed Dr. Wilkins speak about women he did residency with disparately, referring to one of them as "whore".

### FIRST CAUSE OF ACTION:
**Discrimination Based on Age in Violation of New York State Human Rights Law (Executive Law, Article 15), § 296(1)(a) and the Employment Act (ADEA).  29 U.S.C. 621 *et. seq.***

92. Plaintiff repeats each and every allegation set forth herein in the preceding paragraphs as though fully set forth herein.

93. Plaintiff has pleaded facts that meet each and every element of these claims.

94. Plaintiff has established a cause of action for discrimination based on age in violation of the ADEA and NYSHRL.

## SECOND CAUSE OF ACTION
**Discrimination Based on Familial Status in Violation of New York State Human Rights Law (Executive Law, Article 15), § 296(1)(a) and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et. seq.**

95. Plaintiff repeats each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

96. Plaintiff has pleaded facts that meet each and every element of these claims.

97. Plaintiff has established a cause of action for discrimination based on familial status in violation of Title VII of the Civil Rights Act of 1964 and NYSHRL.

## THIRD CAUSE OF ACTION
**Sexual Harassment in Violation of New York State Human Rights Law (Executive Law, Article 15), § 296(1)(a) and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et. seq.**

98. Plaintiff repeats each and every allegation set forth herein in the preceding paragraphs as though fully set forth herein.

99. Plaintiff has pleaded facts that meet each and every element of these claims.

100.    Plaintiff has established a cause of action for sexual harassment in violation of Title VII of the Civil Rights Act of 1964 and NYSHRL.

## FOURTH CAUSE OF ACTION
**Discrimination Based on Sex in Violation of New York State Human Rights Law (Executive Law, Article 15), § 296(1)(a) and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et. seq.**

101.    Plaintiff repeats each and every allegation set forth herein in the preceding paragraphs as though fully set forth herein.

102.    Plaintiff has pleaded facts that meet each and every element of these claims.

103.    Plaintiff has established a cause of action for sexual harassment in violation of Title VII of the Civil Rights Act of 1964 and NYSHRL.

**FIFTH CAUSE OF ACTION**
**Hostile Work Environment because of Sex/Sexual Harassment in Violation of New York State Human Rights Law (Executive Law, Article 15), § 296(1)(a) and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et. seq.**

104.    Plaintiff repeats each and every allegation set forth herein in the preceding paragraphs as though fully set forth herein.

105.    Plaintiff has pleaded facts that meet each and every element of these claims.

106.    Plaintiff has established a cause of action for sexual harassment in violation of Title VII of the Civil Rights Act of 1964 and NYSHRL.

**SIXTH CAUSE OF ACTION**
**Retaliation for Opposing Discrimination in Violation of New York State Human Rights Law (Executive Law, Article 15), § 296(1)(a) and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et. seq.**

107.    Plaintiff repeats each and every allegation set forth herein in the preceding paragraphs as though fully set forth herein.

108.    Plaintiff has pleaded facts that meet each and every element of these claims.

109.    Plaintiff has established a cause of action for sexual harassment in violation of Title VII of the Civil Rights Act of 1964 and NYSHRL.

***

**WHEREFORE**, Plaintiff respectfully requests this Court to enter an Order awarding Plaintiff:

A.    A judgment awarding the Plaintiff compensation for her lost wages and other benefits;

B.    Damages for the Plaintiff's pain, suffering, loss of enjoyment of life, humiliation and other injuries in an amount to be determined at trial;

C.    A judgment awarding Plaintiff reinstatement;

D.      Defendant to pay Plaintiff the costs of this action, together with reasonable attorney's fees and disbursements;

E.      Directing Defendant to pay all unreimbursed medical costs incurred by Plaintiff as a result of the stress and anxiety she suffered resulting from the discrimination, including diagnostic analysis, treatment and therapy, and follow-up therapy;

F.      Injunctive relief as this Court deems just and equitable;

G.      Defendant to be assessed punitive damages; and

H.      Plaintiff to have such other and further relief as this Court deems just and equitable.

*** 

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) Fed. R. Civ. P., Plaintiff hereby demands a trial by jury for all issues triable of right by a jury in this case.

Dated: June 30, 2022
        Buffalo, New York


Respectfully submitted,
Plaintiff Dr. Melissa Franckowiak,
By her attorneys


_s/Lindy Korn_
Lindy Korn, Esq.
Cat McCulle, Esq.
*Attorneys for Plaintiff*
The Law Office of Lindy Korn PLLC
Electric Tower
535 Washington Street, Ninth Floor
Buffalo, New York 14203
Telephone: (716) 856-5676
Facsimile: (716) 507-8475
Lkorn@lkorn-law.com
cmcculle@lkorn-law.com

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DR. MELISSA FRANCKOWIAK,

PLAINTIFF,

vs.                                                          **VERIFICATION**

Civil Case No.

CATHOLIC HEALTH, and GREAT LAKE
ANESTHESIA,

DEFENDANTS.

---

DR. MELISSA FRANCKOWIAK, under penalty of perjury, deposes and says:

I have read the attached Complaint captioned in this matter and find it to be true to my knowledge, except as to matters alleged upon information and belief, which I believe to be true.

_____

DR. MELISSA FRANCKOWIAK

Sworn to me this 30ᵗʰ day of June 2022

_____

Signature of Notary Public

